Good morning. Good morning, Your Honor. I'm Lizandra Lopez of the Federal Defenders in San Diego. On behalf of the juvenile on this matter, I would like to reserve two minutes of my time for your thought. Sotomayor How long? Lizandra Lopez Two minutes. Sotomayor Okay. Thank you. Lizandra Lopez Your Honors, we are requesting for reversal in this case for three reasons. First, the Juvenile Delinquency Act violations committed by the agents were so egregious that the juveniles' due process rights were violated and required mandatory reversal. Second, even if this Court finds that there was no due process violation, that there was prejudice, since the prosecution did rely on an improper confession resulting from the government agent's failure to comply with the requirements. And finally, insufficiency of the evidence supports this conviction. First, in regards to the Juvenile Delinquency Act, the agents in this case violated every single one of the requirements in the Act, even though the requirements are unambiguous, and I believe there's only four requirements. And even though this circuit for 20 years has held, has indicated what those requirements are, and has indicated that the agents in the Southern District of California repeatedly violate the requirements, and we submit that violations in this case are the most egregious in the precedent of the 20-year precedent. For example, the first requirement is that the arresting officer shall immediately inform the juvenile of his rights. Here, the agents waited six hours prior to informing the juvenile of his rights. He was arrested sometime between 4.45 and 5 o'clock in the morning, but they waited until 10.55. And the government's brief indicates that the reason for this delay was because the juvenile failed to provide parent contact information. This is disingenuous. If we look at the record, the arresting agents, Enriquez, an arresting agent, and Bronack, specifically stated that at no time did they ask for parent contact information. And the first time that there was any effort to obtain contact information was when Agent Gutierrez arrived at the station and spoke to the juvenile at about 10.55, and that was the first time that he ever asked for parent notification. And I'd also like to note that in the supplemental excerpt of record in the government's own motions illuminate, they indicate that at about that time, the juvenile did inform the agents that he was living with his uncles in Los Angeles. He provided his uncle's full name and address in Los Angeles, but they made no effort to contact the uncle then. Instead, they waited until two hours after his arraignment at about 6 o'clock in the evening. Counsel, I think that the panel is fully conversant with the facts and that there were violations, clearly. What the government is trying to tell us is that they did not use his statement in the judicial proceedings, and therefore, that no harm, no foul. How do you respond to that? I believe there was a harm, Your Honor. First, in regards to the due process violation, this Court indicated in Doe 3 that there is a due process violation when the minor waives his Miranda rights in an involuntary, not knowing, and unintelligent manner. And that's exactly what happened here. The juvenile in this case was 6 hours isolated in a holding cell, and 5 hours after, he specifically and unequivocally told the agents that he wanted to speak to the Mexican consulate. He was denied that right. Again, the government's brief indicates that he did, in fact, speak to the consulate. That's contrary to the record. The district court made a factual finding that he, in fact, did not speak to the consulate. And not only was he denied this right, it can't be said that he voluntarily, knowingly, and intelligently waived his right to speak to an attorney when he was not. Well, so, but tell us what the prejudice was. I mean, tangibly, what is your argument that the prejudice was? And also, did the district court address prejudice? I — if we go on to the prejudice requirement, first of all, I think there was a due process violation, and that in and of itself requires mandatory reversal. And now, looking at the prejudice, there was prejudice. The district court did not make a factual finding, or did not make a finding as to the prejudice, because they determined that since the statements didn't come in at trial, there was no prejudice. But — I did — I did find — well, I did find someplace in the record where the district court was using the words prejudice, talking about that. Yeah. I believe at — I think at page 240 of the excerpts of record, the district court says, I quote, Obviously, the prejudice would stem principally from the use of any such confession, but that is absent here, since there is no evidence being received of his confession, and there is not any other prejudice or constitutional violation arising simply from the other conduct attributed to the Border Patrol agents. That is the consulate issue, and the delay in Mirandizing doesn't this amount to a — so, doesn't — didn't the court address prejudice? Well — I mean, what was the court talking about there? Well, what the court found was that there was no prejudice, and they relied on prior precedent where it held that failure to provide parent notification was insufficient to constitute prejudice. Okay. So — so you don't agree with the district court's analysis of prejudice, but the district court did address prejudice. Right. I believe — I apologize, Your Honor. What I was referring to was the first prong of the prejudice test to determine whether his confession was a result of the violations of the right — of the violations of the act. But they did address — the district court did address the second prong by saying there was no prejudice because it wasn't used at trial. But, in fact, there was prejudice because the juvenile statements were, in fact, used to prosecute him. Looking at Excerpt of Record 8, the information specifically cites statements made by the juveniles during — by the juvenile during this video statement. By the juvenile who? Excuse me? By the juvenile who? By the juvenile during the video statement. Oh. I think that's Excerpt of Record 8. So they did rely on — on the statements to prosecute the juvenile. And, furthermore, without this — and because there was — the court didn't make an actual finding as to whether or not the involuntary statements made by the juvenile stemmed all the other evidence that was actually received by the agency. Well, but he can't — okay. But you have, what, three people that they detain that test — don't they testify as to what's going on in the vehicle, although they can't identify the juvenile. But then you've got an agent that says something orange, and they've got everyone running, and they catch your client, you know, with something orange on. I think there's two parts to this. First of all, the material witnesses couldn't provide any evidence whatsoever regarding a financial arrangement and the juvenile. There was no connection. The connection was the statement made by the juvenile that he — he attempted to enter the country. He met a smuggler. The smuggler said, drive the car, and you'll be able to pay half of the smuggling fee. And that was the financial arrangement. Do you want to save time? Yes, Your Honor, if I may. You're getting down. Well, I'm going to ask a question. Okay. Go ahead. Give her a little more time, please. We have a case here in which Congress has specifically set forth in the Juvenile Justice Act specific things that officers, policemen, have to do. Correct. In this case, exactly nothing was done according to the statute by the police officers. Correct. In fact, the police officer nullified an act of Congress. Right? Right. Now, isn't that prejudice enough to the juvenile justice system to warrant that we cannot permit that to happen? That's correct, Your Honor. I absolutely agree. And I believe affirming this conviction, that's — it's telling the agents in the Southern District of California that they can violate all they want. They've been doing it for 20 years. They can keep on doing it. It's an insult — it's an insult to Congress. It's an insult to the federal government that police officers can violate acts, specific acts, telling them what they have to do when they approach juveniles. Correct, Your Honor. And I would also say that the act — And it's got to stop someplace. The act is unambiguous. It's clear. It says, immediate, immediate, forthwith. And none of those acts were complied with. I'd like to reserve my remaining time. All right. I'll give you a minute on recital. Thank you.  May it please the Court, good morning. Christopher Alexander for the United States. As indicated by counsel, there are basically two issues here that the Court must decide. The first issue is whether or not the alleged violations of the Juvenile Delinquency Act or the JDA warrant dismissal of the information. And second, whether or not there was sufficient evidence for the district court to find beyond a reasonable doubt that — Well, there's a bigger issue. Can police officers nullify acts of Congress? No, Your Honor. They cannot. They cannot? No, they cannot. And they did in this case. Well, Your Honor, what they — Could not be the end of it? No. Well, the analysis begins with this. You're asking us to forgive the officer for nullifying an act of Congress? No, Your Honor. I'm not asking the Court to do that. What I'm asking the Court to do is to look at what the purpose of the JDA is. The purpose of the JDA is to provide prophylactic protections for the juvenile. And in this instance, the idea is to provide the juvenile with notice of his rights, to provide the parent's notice of the rights, and if the parents aren't available for a foreign national, to then provide notice to the consulate official. And you take him immediately to a magistrate. And take him immediately to a magistrate. Here he wasn't taken to a magistrate, what, 10 hours later or something like that? That's correct, Your Honor. And looking at the case file — Is that permissible? Yes. Why? It's permissible. Congress says it isn't permissible. Well, Your Honor, the idea is to take the juvenile to a magistrate judge forthwith. And that's what the agents did in this particular case. You have to keep in mind the facts as they lay out. The juvenile was apprehended, as indicated by counsel, approximately 4.50 or 5.30 in the morning — or 5 o'clock in the morning. At that point, as indicated by Judge Callahan, the agents knew that the juvenile was, in fact, the driver of the vehicle based on Agent Sartato's own testimony. We've got a case coming up sometime later on that the magistrate was made available at 2.30 in the morning on another matter. Yes, Your Honor. And there's no question as to what's involved there. But, however, after apprehending the juvenile, they didn't know his juvenile status. They were interviewing the other witnesses that were in the vehicle. And in processing those individuals, they finally reached the juvenile at approximately 6.30 in the morning, at which point they became aware of his claimed juvenile status. However, that claimed juvenile status was in direct conflict with the juvenile's prior apprehensions, in which he had indicated that he was actually over the age of 18. Nevertheless, Agent Enriquez picked up the phone and attempted to contact the Mexican consulate at that point. Again, trying to comply with the provisions of the JDA, providing notice to the consulate, but they didn't answer. So, in the end, he told the juvenile that he would attempt to contact the consulate at a later time. Now, this Court's own decisions, for example, in Juvenile R.R.A., indicates that the agents should actually wait to speak with the juvenile until such time they have an opportunity to contemporaneously provide notice to either the consulate or the parents. But in this instance... The consulate? Yes. So, at what point are they supposed to give the juvenile his rights? Well, Your Honor... Aren't they supposed to... It's supposed to occur immediately. And the idea is that it occur immediately, but the Court has specifically said that the advisement of rights should take place contemporaneously with notice to the parents or the consulate. So, as a result, the agents couldn't actually comply with the notice provisions of the JDA because at that point they couldn't get in contact with the consulate and they didn't know any contact information for the parents. But this makes no sense. If they can't get a hold of the parents or the consul, surely they proceed to give the rights. Well, that appears to be in contradiction with the decisions of this Court, actually. One of the problems that RRA found is that there was a parental notification problem and that... Counsel, why don't you wait until the helicopter leaves? And that in failing to wait for the consulate to attempt to locate the parents in RRA, that was found to be a violation. Well, but give him his rights and then don't question him until you can get a hold of the consul or the parents. That's what's common sense. Well, in the alternative, what the agents did is they actually placed the juvenile separated from all the other individuals and did not interview him. It wasn't a situation where he was, you know, handcuffed or, you know, to a bench. He wasn't threatened with jail. None of the things that occurred in RRA occurred in this case. The juvenile was placed separately from the aliens, placed separately from any of the adult offenders that were also apprehended at the checkpoint. And then Agent Enriquez contacted senior patrol agents so that they could respond to this prosecution. Because at that point, they made a determination that based on this juvenile's prior history of fleeing checkpoints, that he was going to be prosecuted. So then the senior patrol agents responded to the area, leaving from the San Diego area, approximately 50 miles away, to where the checkpoint was located. They arrived at the checkpoint, and prior to their arrival, another senior patrol agent, Agent Holt, had again attempted to contact the Mexican consul at approximately 10.15. And that's indicated in the excerpt of record at 8 and the statement of facts attached to the information. So at that point, there was a second attempt to contact the Mexican consulate and provide notice regarding the juvenile's apprehension. So again, there was efforts to comply with the Juvenile Delinquency Act. After arrival, the other senior patrol agents waited for approximately 40 minutes and having heard nothing additional from the consulate or from the juvenile's parents, then advised the juvenile of his Miranda rights. And there's no question in the record whether or not those rights were given and whether or not he voluntarily waived those rights. And in fact, he was actually given the rights twice. He was given the rights once at 10.55 and again at 12.40, prior to making his statements regarding the smuggling of the illegal aliens. So in this instance, while the JDA Act as found by the district court was violated, it wasn't an egregious violation. It wasn't as though the agents didn't make efforts to comply with the Juvenile Delinquency Act. They did make efforts, and those efforts were reasonable. And in the end, based on the due process argument, if you look, is there a violation? The district court found that there was a violation. And the juvenile actually alleges six separate violations. The first five concern the notice provisions. The final one concerns whether or not the magistrate judge, whether the juvenile was taken to the magistrate judge forthwith. The district court found that there was a violation concerning the notice provisions in that they didn't properly notify the consulate and that they didn't immediately notify the juvenile of his rights. And that was a district court found. But in the end, you go through the analysis. Was there a due process violation? Well, in the first of many Doe decisions in 1983, there was a violation of the parental notification and for failing to notify the Mexican consulate. They found no due process violation in that particular case. And I would like to... Counsel, you made the statement that they'd already decided to prosecute. What's in the record that would substantiate that? Well, Your Honor, it would be that they had already contacted the special agents in order to respond to the checkpoint. They were responding to the checkpoint so that they could investigate and prosecute this case. But they hadn't made a decision to prosecute at that point. Is that right? No, Your Honor. In fact, they had made a decision to prosecute based on this particular juvenile's... Whose decision would that be to determine whether they're going to prosecute? Well, the matter is actually referred to a prosecution's unit. And the prosecution's unit looks at prosecution guidelines and makes determinations as to whether or not a case is appropriate. And in this instance... Well, when was it referred in this case? Well, Your Honor, it was referred sometime between 6.30 and approximately 9.00 a.m., in which the... Prior to the patrol agents, the special agents responding to the checkpoint and being called to respond to the checkpoint. At that point, there had been a decision made. What's in the record that substantiates that? Well, Your Honor, I think you would look to the testimony of the special agent in the case regarding him receiving a call to respond to the checkpoint in order to investigate and prosecute. So, in the end... It's to investigate, not... The decision wasn't really made at that point when they called him. Is that right? No. Well, the decision was made by the investigative agency that they were going to prosecute this case based on his prior record. Again, as indicated by Agent Hurtado, this is not the first time that this juvenile has run the checkpoint. He's actually run the checkpoint on other occasions. So, in the end, you'd look to, you know, when was the decision made? The decision was made long before. In the end, you'd look at what was the... You need to sum up, because your time's up. Yes, Your Honor, I see that. I know. In the end, you look to, is there a due process violation? And as held by this Court, failure to comply with the notice provisions for the consulate does not warrant a due process violation. At the next level, you look to see is there prejudice, and was there prejudice suffered? Again, consistent with the Doe decision from 1983, the United States self-remedied. The United States did not utilize the juvenile's post-arrest statements against him at the proceedings. And, in fact, the evidence that was in the information was the same evidence that was presented to the district court judge, which the district court judge was able to find, beyond a reasonable doubt, that the juvenile, in fact, committed the offenses for which he was charged in the information. Let me just ask you this on my nickel. Did the district court make a finding of no prejudice? Yes, Your Honor. And in the reply brief by the defense, they specifically stated at page seven that the district court did not reach this issue. However, as indicated by you, Judge Callahan, on excerpt from record page 240, the district court specifically addressed the prejudice problem and found that there was no prejudice. On my nickel, in finding no prejudice, they didn't look at whether this violation or conduct had contributed to their decision to prosecute. Well, Your Honor, the argument had been presented to the district court regarding whether this additional information being contained within the information would have, in fact, created an issue for prejudice. So the district court was aware of this argument at the district court level. Well, I might have been aware of it, but I didn't see where they actually found no prejudice from that. Well, Your Honor, the argument was made that based on the information that was filed by the government, and that's at the bottom of actually 240, and the district court again went through and said that that did not provide a sufficient basis to find that there was a prejudice in this particular case. So the argument was made, but it was rejected. All right. Thank you. Thank you. Thank you for your argument. All right. You have a minute. Thank you, Your Honor. I'd just like to state that the violations committed by the agents are much more egregious and unreasonable than depicted by government counsel. The six-hour delay wasn't caused by the inability to contact the parents. They never asked for parent information until about 10.30 or 10.55 in the morning, six hours later. If they would have asked for parent contact information at 6 a.m. when they found out that he was a juvenile, then they would have been able to read his rights then, but they didn't. And I think, and I'll direct the Court to Executive Record 136, 148, and 220 for that information. And I think the critical point here also is the fact that the juvenile in this case specifically and unequivocally asked at 6 a.m. to speak to the consulate. It was denied. This is where not only did because not only did they not notify the parents or the consulate of his rights, but they denied his right which he invoked to speak to the consulate. And this shows bad faith, and I think the government addressed this. It's part of I think part of the reason why they didn't do the requirements is that they didn't believe that he was in fact a juvenile, so they just believe that they can not comply with the requirements. All right. Your time is up. This matter will now stand submitted. Thank you for your argument. United States of America versus Marcelino Carrales Quintero 0555132
judges: B. Fletcher, Ferguson, Callahan